Good morning ladies and gentlemen. Our first case for argument is Eike v. Allergan. Mr. Ostfeld. May it please the court, defendants respectfully submit that the district court committed three errors when it certified eight classes, challenging how 10 different defendants design and sell 33 distinct prescription glaucoma drugs. First, the district court was without jurisdiction to enter its order because the plaintiffs lack Article III standing. Second, the district court failed to undertake a rigorous analysis of the class certification record before certifying the classes. Third, the district court adopted a class-wide damages model that is at variance with the standards set by the Supreme Court in the Comcast case. Beginning with the issue of standing, last year the Supreme Court in Spokio reconfirmed the fact that the injury in fact element of standing includes a separate and distinct concreteness component, which concreteness means the injury must be de facto, that is it must actually exist. Here, the plaintiffs readily acknowledge that they received safe, effective, FDA-approved prescription glaucoma drugs that worked exactly the way they were supposed to for years or decades. They're not alleging they were deceived. They're not alleging that they got anything other than what they paid for. What they are claiming is that they are suffering what they are now calling a pocketbook injury in retrospect because they claim that they were forced to waste product. But the way they get to that conclusion is fictitious. What the plaintiffs are doing is comparing the actual products, the commercially available products that they purchased on the market to hypothetical products that are not on the market. Is this really a concreteness problem or is this a problem that there has been no invasion of a legally protected interest? Or both? I think it's both, Your Honor. We've been focused on the concreteness component because, simply put, there's nothing concrete to it. There's nothing real. There's nothing actual here. What the plaintiffs are essentially saying is anytime a consumer can conceive of a hypothetical alternative design for a product on the market that they claim would have been more efficient or better, they've suffered an injury in the form of waste that allows them to go into federal court. That can't possibly be the case. It opens the gates to all manner of lawsuits. As the Supreme Court noted in Lujan decades ago, standing is not supposed to be an ingenious academic exercise in the conceivable. That's exactly what plaintiffs are proposing. Any conceivable product design could give rise to a federal lawsuit. What plaintiffs say about this is, well, that's OK. Standing is a low standard. Let these cases into court. And then the bad cases, the ones that are like toothpaste left in the tube or peanut butter left in the jar, those cases will be disposed of on the merits. But as the court noted just a couple of weeks ago in the Gubala decision, one of the functions of Article III standing is to reduce the workload on the federal judiciary. The courthouse gates don't do much good if they're always left open. They have to be closed to some claims. And in this case, they should be closed to the plaintiff's claims because their injury is fictitious. Now, turning my attention to the district court's class certification analysis, we've identified a number of problems with the district court's analysis on the individual Rule 23 elements. But the problems boil down to the same problem in multiple variations, which is the district court simply did not undertake anything resembling a rigorous analysis of the class certification record. It acknowledged that there was competing testimony, competing reports, competing opinions. And then it said it's not the role of the court to evaluate that evidence at the class certification stage, kicked it out of the merits phase and said, well, let the finder of facts decide. Respectfully, that is in no way consistent with the precedent of the Supreme Court and with the precedent of this court. The defendants built respectfully a compelling record against certification in this case, including most notably the opinions and reports of five experts challenging the very underpinnings of plaintiff's class certification theory. These reports came in uncontested, uncontested. The plaintiffs did not take the depositions of these experts. They issued no rebuttal reports. They did not challenge the opinions or conclusions of these experts in any way, not just in a meaningful way, in any way. What they said instead is that's all right. They gambled on a tactic that this court has repeatedly disproved. They said that it's enough if we're stating our intention to try this case using common evidence and a single methodology. And so long as we intend to do so and we proffer the reports of putatively competent experts that show how we plan to do so, that's enough to get past Rule 23, and then everything else moves over to the merits. And they say that's okay because if they're not able to meet their – if they're not able to do what they said they're going to do through their experts and through their intended class-wide proof, then they'll lose, and therefore the case goes away. If they lose it to one plaintiff, they lose to all plaintiffs, and that's their proposed resolution of the case. If that – well, that's, of course, true of all class actions. In a case where you can't prove your class-wide proof, you lose on the merits. But that doesn't mean you get to skip the class certification stage. In fact, in the Parco v. Shell Oil case, this court rejected exactly what plaintiffs are proposing to do in this case. It said it's not enough to say that you intend to rely on common evidence and a single methodology. Intents are just hopes. If there are disputes that bear on issues vital to class certification, it is the obligation of the district court to receive evidence and resolve those disputes before moving the case forward. Likewise, in the West v. Prudential case, the court made clear that hiring competent experts is not enough. That would be delegating judicial power to the plaintiffs by allowing them to get a class certified simply by hiring the right expert. You can't duck hard questions. You have to resolve the clashes of the experts at the class certification stage to the extent that the clash bears on issues vital to class certification. Do you really want a do-over, or do you want us to do that work? Your Honor, the record is complete. The plaintiffs had their opportunity to make their record. The district court had a chance to evaluate it. We would respectfully submit the court can just decide this issue. The record is full here, and when you look at the expert reports that came in uncontested from defendants' experts, there is no path to class certification here. I would respectfully direct the court's attention in particular to three reports. The report of Dr. Bartlett, which is Item No. 176-33 in the record. That's Exhibit HH to the Memorandum of Law in support of class certification. The report of Dr. Michael Balin, which is Exhibit II. That's Item No. 176-34 in the record. And the report of Dr. Stephen Wiggins, who rebuts plaintiffs' Comcast class-wide damages model. That's Exhibit KK at Exhibit 176-36 in the record. If you feel like doing some additional reading, the reports of Drs. Aerosmith and Lynn at 176-32 and 176-35 provide further context for the superiority argument, because they demonstrate why what plaintiffs proposed can't be done without involving the FDA and its agency expertise in these matters. So the Wiggins report I'd like to use as an illustrative example of what went wrong here. The district court adopted the damages model put forward by plaintiff's statistician, Dr. Kriegler. Dr. Kriegler's model is essentially an arithmetic exercise. He says, I'm assuming a direct proportion between drop volume and the costs incurred by class members, and I can calculate that percentage by comparing the average drop size of defendants' drops, as calculated in laboratory testing, versus the optimal drop size of 16 microliters, which plaintiffs claim is the best drop size for all glaucoma drugs and all patients. And he says, as long as I assume this direct correlation between drop volume and cost savings, I can calculate the cost savings for each class member. Dr. Wiggins' report comprehensively criticizes that model. He identifies why the economic assumptions are wrong, why the methods are wrong, why the outcome is wrong. Dr. Wiggins' report leaves no doubt that Dr. Kriegler's damages model is the very epitome of an arbitrary speculative model. It's not grounded in fact. It's not grounded in sound economic theory. It doesn't do what Comcast says a model has to do. It doesn't translate plaintiff's theory of liability into a viable class-wide damages model. Does anyone manufacture and sell the little drops? The micro drops? No, Your Honor. Nobody manufactures or sells. At least nobody that we're aware of. Nothing in the record suggests that micro drops are commercially available. So that's one example. And this is repeated over and over again on all the elements of class certification. Commonality, predominance, superiority, typicality. The reports of Drs. Bartlett and Bailyn that I'm referring you to undermine the very premise of plaintiff's case. Plaintiff's case rests on a faulty assumption that every glaucoma drug has an optimal drop size for every single glaucoma patient and that's 16 microliters. Drs. Bartlett and Bailyn exhaustively criticize that. They criticize it from a scientific standpoint. They criticize it from a care and treatment standpoint. They criticize it from the standpoint of their own experiences with their patients and what their patients have been able to achieve with commercially available drops. They demonstrate that there's simply nothing to and they also criticize the studies that plaintiff's expert, Dr. Robin, relies upon that plaintiffs call the consensus, a general scientific consensus. These are a series of underpowered statistically incoherent studies that are purporting to draw a few tentative conclusions about a few drugs on the market. Nobody has tried to draw the conclusion that Dr. Robin has that 16 microliters is the right drop size for all patients across all drug categories. Are these studies that you just mentioned the genesis of these lawsuits largely? Your Honor, I think they are but that would be a question for plaintiff's counsel. We don't really know the full genesis of the lawsuit. We know a few things that happened as the lawsuit emerged but not how it was initially conceived. Respectfully, we don't think there's much science to it. The evidence is clear that every glaucoma patient is different, that every glaucoma drug is different, that physical and behavioral characteristics in the individual patients make a huge difference and that the drug categories make a huge difference. I see that I'm into my rebuttal time. Unless the panel has any further questions, we would just ask that the order be reversed. Thank you, Ms. Drostenfeld. Ms. Nichols. Good morning and may it please the court. My name is Leah Nichols and I represent the plaintiff's appellees. Contrary to the assertions of defendants, plaintiffs have Article III standing to bring their claims and the district court did not abuse its discretion in granting class certification. Plaintiffs allege that defendants' practice of packaging their prescription eye drops and droppers that emit far too large drops violates the Missouri and Illinois Consumer Protection Act. Are you charging them with conspiring? No, Your Honor. We do not bring a conspiracy charge here. What the claim is is it's an unfairness claim under Illinois and Missouri law. Both of those statutes incorporate the FTC's. But now, if the smaller eye drop is better, why doesn't someone manufacture and sell it? Your Honor, the allegations that we have in the complaint as to that are because it would enable defendants to make more money. Because if the drops are larger, then they can sell more products. Yes, I know, but there are lots of actual and potential manufacturers. Why wouldn't, if this little drop is better, why wouldn't one of them decide to make and sell the drop and help compete these companies with their larger, more expensive drop? Your Honor, I think that's a question. I mean, we don't usually condemn companies because no competitors have stepped up against them, right? If they were conspiring to exclude other companies from making the little eye drop, that would be one thing. You're not accusing them of that. For some reason, the market seems not to be interested in the little drops. Your Honor... Let's see what that has to do with the law. I don't get that. There are a lot of products that you can imagine that are not made, right? Because there isn't a market for them. Usually, if there's a market, someone will produce for that market. Your Honor, I think the difference here, in this case, is that except for the experts that defendants have hired for this litigation, with the exception of those experts. Well, you hired experts too, right? Right. Well, yes. So you can't criticize them for hiring experts. No, and to complete the thought, with the exception of those experts, the scientific consensus, and this is before this litigation was ever brought, the scientific consensus is that 16 microliter or smaller drops are seen as effective. So why has no company in the world decided to manufacture and sell these smaller eye drops? Again, Your Honor, our allegation is because what we know, and again, I think this is a question that's better directed at defendants, quite frankly, is that they can sell more product this way. That what? That they can sell more product. I know, but there's no company in the world that could make money selling the smaller eye drop, which you think would sweep the market because it's superior. No one in the world, no one in a foreign country says, yeah, I can make a fortune selling this smaller eye drop cheaper. Your Honor, I can't speak for the- We don't usually use law in order to generate new entrants into markets. Your Honor, all of these questions go to the merits of- No, they don't. They make the case sound ridiculous to me. I've never heard of a case like this.  selling the same product. They're not conspiring. There's no violation of antitrust law. They've just decided the large eye drop is the better product for their market. They'll make more money doing it. And if there are opportunities for competitors to carve away their business, then you expect the competitors to enter. Your Honor, this court has- I mean, this is a worldwide market. Companies all over the world make drugs and so on. Germany, Netherlands, Finland, everywhere. So you'd think if there really was any merit to your argument, there would be other companies would have begun manufacturing and selling this small eye drop. Your Honor, what we know is that studies from all of those countries, studies from all over the world, including- Yes, okay. So why isn't any drug company in the world making and selling the little eye drop? That could be a vast conspiracy, but you're not arguing conspiracy. Your Honor, what we do know is that there's evidence in the record that there is a catalog of droppers that included, say, an 18-microliter dropper, that that is commercially available for defendants to use. I don't know why they haven't used it, if not to sell more product. Their internal decisions on that is not something that we've reached here. So you have no theory as to why they're selling the large and not the small eye drop? Your Honor, our theory is that this enables them, that they don't have any incentive to sell the smaller eye drops, that they can make more money. Dr. Robin was long a consultant for- Why is there no competition in this industry? Your Honor, there is some competition. What we know is that smaller eye drops actually do lessen the cost of treatment. So there are companies making and selling the smaller eye drops? Relatively. What do you mean relatively? Are there companies that compete by selling the smaller eye drop? None of them are as small as 16 microliters, but within the range that exists today. So the answer is no? The answer is- No? The answer is no? With regard to 16 microliters. Now, there are differences, say, between 25- It's very odd to have a market in which the best product is not made and sold. That doesn't sound like capitalism. Your Honor, the unfairness claim that's being brought here is about, do consumers have a chance to reasonably- But that's ridiculous. That's like saying if you can think up something that consumers, if they were smarter, would want, then you can sue companies because they're not catering to this market that doesn't exist because the consumers aren't interested in the little eye drops? That's all of a question of whether plaintiffs have stated a claim under state law. And the defendants filed a motion to dismiss on that basis in the district court, and it was denied. It also goes to standing, though. You have to allege a cognizable invasion of a legally protected interest. And if you don't have a legal right to the most efficient drop dispenser, and I can't see any legal theory that would support such a claim, then you don't have a cognizable injury for standing purposes. Your Honor, the standing here is that defendants conduct forced plaintiffs to spend money on product that they couldn't use. Right, but you need to have a colorable claim of an invasion of a legally protected interest. And if you don't have a legally protected interest to a more efficient drop dispenser, and again, I see no legal theory under the state statutes here on the unfairness ground that you've asserted that you can make that claim so there is no injury. Your Honor, the legally cognizable right that's been invaded here is the right to be free from unfair business practices. Well, there's nothing unfair about this for the reasons that Judge Posner has just pointed out. Again, that's a question on the merits. Well, no, it is a question of standing as well, because you have to allege an injury in the spokio sense, which is a concrete invasion, a concrete injury, an injury in fact, that is based on an invasion of a legally protected interest. And if you don't meet both of those elements of injury in fact, then you don't have standing. And this Court has always recognized that when you bring a consumer claim and there's a difference between, say, for example, in the Aquedots case there, there was an allegation that the products were defective. And this Court said, with very little analysis, I think because it was very obvious, that the… This isn't a defect claim. No, it's an unfairness claim. And so the question is, have they stated a claim under the unfairness standard? And the District Court held that they did. And that's a question on the, again, whether they've stated a claim under state law. No, the question is embedded in the standing analysis. This is not a merits issue. It's a standing issue, whether you've got a concrete injury in the spokio sense, and you need both of the elements that spokio emphasized. How can it be unfair to sell a product legally, not conspiring with the other people who sell it, and it happens to be expensive, and there could be a cheaper substitute, but no one has been interested in producing, obviously don't think it has a great market. How can that be unfair? That's the economic system we have. Your Honor, I think the fact that we're dealing here with… Suppose I have a car that I paid $60,000 for, and could you come along and say, well, actually, you know, it's possible to have an almost identical car that only costs $40,000, so I ought to get my money back. Is that possible? I don't think that that survives the unfairness analysis, Your Honor. Why? And it doesn't, because… It's the same point. There's a cheaper product that's just as good, just nobody's making it. It's not the same, and the reason that it's not the same, and I think this court can go back to Batson and look at why the district court explained that this case is not like Batson. There are three elements to the claim under the FTC standard, and one of those is that it's not reasonably avoidable by the consumers themselves. So these are folks who depend on these medications to avoid going blind. Well, I just gave an example. Right. I can't go and tell someone, I've got to have a $40,000 car. Right. Right? If no one is making it, I don't have any recourse at all. Your Honor, I think the car scenario is different in… Why? In quality than medications that consumers… Why? Suppose it has superior quality to my car, to my $60,000 car. It's not only cheaper, it's better, but no one makes it. Your Honor, with regard to the car scenario, there are a lot of different cars on the market. Yeah, but in my example, there is no cheap substitute for this particular car, just as there's no tiny eye drop substitute for these companies. With a little less gas, perhaps. That would be a good analogy. Your Honor, what we do know here, standing here today, is that drops that are relatively smaller decrease the cost of treatment for consumers to go back to Judge Bauer's earlier question. There are studies, the Hartenbaum study, which is located at ECF 195-4. So why does no company make these great little eye drops? Your Honor, frankly, I think that's a question for the defendants. Again, we've argued… What a question for the defendants. You're not accusing them of conspiracy. There are a zillion drug companies around the world. You're saying this is a superior product. Why isn't anyone making it? The evidence in the record, well, the evidence in the record is that, at least with regard to Alcon, that they chose to do this because it would make them more money. That's the evidence that we have in the record with regard to Alcon. So people are required to make products to produce less money for them? Your Honor, again, this goes to… Just academically. Sorry? Just academically, you're required to produce your profits by producing something somebody else just wants in the abstract, but there's nobody else who wants them, apparently. Again, that's governed by the unfairness standard here. So here, consumers are essentially forced to spend money on a product they can't use. So let's say… I thought the law of supply and demand was functioning, but apparently not. It's been suspended. It's a little bit different. I would say, Your Honor, it's a little bit different in the eye drop context. Consumers can't say, oh, I'm not going to buy this product. They buy the products that are prescribed by their doctors to fit their particular medical needs, and they have to take these drugs for the rest of their lives to avoid going blind. So they're in a position, one of the elements of the unfairness is, is it reasonably avoidable by the consumer? And here it's not. Now, in a different context, in the car context, in the concert ticket context, that element of the claim may not be met. But here, because these are drugs that consumers rely on to… Well, you'd say all drugs should be governed by this rule. Sorry? You should say that all drugs should be governed by your suggested rule, right? All of the drugs at issue here, yes, because… No, all drugs, not just eye drops. Well, what we have here, though, is… Penicillin, you know? Isn't that the same thing? What we know here is that there's a large body of scientific evidence and scientific study that predated this litigation that… Yes, and usually when you have that, the market responds. The market learns there is this product, and some little company can come along, make a lot of money by underselling the defendants, right? Yes, Your Honor, what we do know is… So why don't you wait for the market to discover this wonderful little eye drop, and some small company will go into competition with the big people, right? I see my time has expired. If I could briefly answer. Again, what we do know is that drops that are relatively smaller, so they're not 16, but there are drops that say the difference between 24 and 20, is that those smaller drops drive the cost of treatment for patients, and some companies are doing that, are making them a little bit smaller, and we do see changes in eye drop size over time. However, and again, what we do… We have a wealth of scientific evidence and scientific study demonstrating that 16-microliter eye drops are safer and effective and would be less expensive for consumers, and because of the particular position of eye drops that consumers can't avoid, they need to take these, that it's an unfair process. So you want the courts, in effect, to determine the evolution of markets and say, yeah, we think it's unfair not to have, I don't know, what? Cars that run on two wheels, cars that run on water rather than gasoline, right? All sorts of economies. For you, the absence of them is unfair, and the existing producers have to be forced to make a different product. It's unheard of. Can you think of an example? Your Honor, the FTC has brought unfairness claims against, for example, funeral homes that bundle their services and have said that that bundling is unfair. So in fact, the FTC has brought unfairness claims against, and there are other unfairness claims out there. Well, have you asked them to bring a claim against these companies? Why haven't you gone to the FTC if they're the fairness cops? Your Honor, that's certainly a possibility, but that doesn't mean that this isn't, that plaintiffs don't also have the right to have their claims adjudicated. Well, I think it does. You have a government agency which specializes, apparently, in fairness, so you'd think that's the place to go. I have a complaint about unfairness. What are you asking judges about? What do we know about eye drops? Your Honor, the state law consumer protection laws have included unfairness in their state consumer claims, so there's a cause of action under state law to bring these claims. So anything that's unfair is illegal? Under state consumer protection law, it meets the elements. Everything that's unfair, right? No, not everything is unfair. Why not everything? It has to meet the components of unfairness under the state law for it to be unfair. So there are standards, right? This is not a standardless world. There are, in fact, standards that a claim has to meet in order to be unfair under state law, but if the plaintiff can meet those elements, and here we say they did, and the district court held that outside of the class certification context that held that plaintiffs had in fact stated a claim under the unfairness, that they have a right to bring those claims. So I'll just, if there are no further questions. Okay. Thank you. Well, thank you, Ms. Nichols. Mr. Ostfeld, do you have anything further? Unless the panel has any further questions for me, I'll waive my rebuttal time. Okay, well, thank you. Thank you very much. Thank you. Thank you very much. Mr. Ostfeld or Ms. Nichols?